**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1035**

FELIX MANUEL MORENO-OSORIO,

        Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

        Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: May 5, 2021                                  Decided: June 23, 2021

Before MOTZ, KING and AGEE, Circuit Judges.

Petition for review denied by published opinion. Judge Agee wrote the opinion, in which Judge Motz and Judge King joined.

**ARGUED:** Arnedo Silvano Valera, LAW OFFICES OF VALERA & ASSOCIATES P.C., Fairfax, Virginia, for Petitioner. Allison Frayer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Melissa Neiman-Kelting, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

AGEE, Circuit Judge:

Petitioner Felix Manuel Moreno-Osorio petitions for review of the orders of the Board of Immigration Appeals ("BIA") determining that he was ineligible for asylum based upon his conviction of a crime of violence; that he was ineligible for withholding of removal; and that he did not qualify for protection from removal under the Convention Against Torture ("CAT"). Finding no factual or legal error, we deny the petition.

I.

A.

The underlying facts are largely undisputed, as the Immigration Judge ("IJ") found that Petitioner credibly testified during his initial hearing. Petitioner first arrived in the United States in 2009, and on December 17, 2016, he returned to Honduras pursuant to a grant of voluntary departure. Upon arriving that day, Petitioner and two of his cousins were confronted by "roughly eight to ten" individuals who may have been members of the Mara 18th Street gang ("Mara 18"). A.R. 142. The gang members, some of whom were armed, told Petitioner "that all those people who come back from the United States come back with money," and ordered that he give them money. A.R. 199. He told them that he had no money, so in response, they demanded that he join their gang. According to Petitioner, when he refused to join, "They told me my life was on the line and that they would kill me if I didn't either join them or give them money." A.R. 201. The gang members gave him the night to consider their demand, and ordered him to meet them at a nearby school the next morning.

2

Petitioner testified that this threat caused him to fear for his life, so he decided to immediately return to the United States without filing a report with Honduran police about his encounter with the gang members. He testified that he believed that filing a police report would not be helpful because "the police do nothing in these cases," as they are "corrupt." A.R. 203. He based this view largely on two anecdotal experiences. First, at some unspecified time in the past, Mara 18 members allegedly demanded that his cousin pay them "rent money," or else they would no longer allow him to operate his business as a taxi driver. A.R. 204. His cousin did not report the incident to the police, however, "because the police let the gang members know if you report." A.R. 205. In Petitioner's view, gang members would have killed his cousin had he done so. Second, Petitioner cited the experience of an individual named "Luis," who he alleged was killed in 2012 after reporting to the police threats he had received from gang members. Petitioner also testified that his aunt told him that the police have not followed up on the report of the December 17, 2016 incident she filed at some point after it occurred. Further, Petitioner testified that Mara 18 members continued to convey threats to him through his family, but had not threatened his family.

In addition to this anecdotal evidence, Petitioner supplied documentary evidence showing that Honduras is "the murder capital of the world, and that '[c]orruption and impunity remained serious problems with the security forces.'" A.R. 52 (alteration in original) (citation omitted). According to the U.S. Department of State Overseas Security Advisory Council's ("OSAC") Honduras 2018 Crime and Safety Report, the Honduran Government "lacks resources to investigate and prosecute cases, and police often lack

3

vehicles/fuel to respond to calls for assistance." A.R. 374. "This means police may take hours to arrive at the scene of a violent crime or may not respond at all. As a result, criminals operate with a high degree of impunity." *Id.*; *see also* A.R. 330 ("Impunity . . . remained a serious problem, with delays in some prosecutions and sources alleging corruption in judicial proceedings."). And according to one newspaper article from February 2014, a Honduran Government investigation at that time accused 196 police officers[1] of committing some form of crime, "includ[ing] money laundering, bribes, extortion, and bank robberies." A.R. 466. The article claimed that the government report "shows how many Honduran police have become allies of drug-traffickers and organized crime." *Id.* Lastly, an OSAC report indicated that some of the 52 murders of United States citizens that have occurred since 2010 "may have been based on tips from sources at airport arrival areas." A.R. 368. Based on all of this, Petitioner claimed that if he were forced to return to Honduras, the police would alert Mara 18 and that the gang members would kill him.

Other record evidence, however, demonstrates that the Honduran Government has undertaken efforts to root out public corruption and gang violence. In April 2016, Honduras created the Police Purge Commission, and from its inception until November 30, 2016—just prior to Petitioner's return to Honduras—the Commission "reviewed the conduct of approximately 14,000 . . . officers and removed 4,445." A.R. 338. Indeed, the State

---

[1] The IJ, the BIA, and the parties on appeal oftentimes refer to this figure as 194. The difference between 194 and 196 is immaterial to the issues on appeal.

Department recognized in its 2017 Human Rights Report that the Honduran Government "took steps to prosecute and punish officials who committed abuses." A.R. 329. The Honduran Government also "implement[ed] a series of police reforms, such as the creation of an Inter-Agency Security Task Force to combat crime." A.R. 374–75. Moreover, homicide rates in Honduras decreased from about 60 per 100,000 in 2011 to about 46.5 per 100,000 in 2016, and in that time the Honduran Government "continued to make significant advances in combatting kidnappings by criminals." A.R. 332.

## B.

### 1.

After fleeing Honduras, Petitioner arrived in the United States on January 3, 2017, where he was apprehended by border officials and received a credible finding of fear during his subsequent asylum interview. The Department of Homeland Security ("DHS") subsequently issued him a Notice to Appear on January 18, 2017, charging him with inadmissibility for failure to possess the proper travel and identity documents, *see* 8 U.S.C. § 1182(a)(7)(A)(i)(I).

After being released on bond from DHS custody, Petitioner was later arrested and pled guilty to unlawful wounding in violation of Virginia Code § 18.2-51. That statute provides:

> If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony. If such act be done unlawfully but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony.

5

Va. Code Ann. § 18.2-51. The state court sentenced Petitioner to twelve months' imprisonment.

In response to the charge of inadmissibility, Petitioner filed an application for asylum, *see* 8 U.S.C. § 1158; for withholding of removal, *see* 8 U.S.C. § 1231(b)(3); and for protection from removal under the CAT. After holding a hearing on December 7, 2018, the IJ denied Petitioner's requested relief.

First, as to the application for asylum, the IJ explained that any applicant who has previously been convicted of an "aggravated felony" is ineligible for asylum. A.R. 146. The IJ found that Petitioner's conviction for Virginia unlawful wounding qualified as an "aggravated felony" because it "require[s] [an] intent to maim, disfigure, disable, or kill." A.R. 146–47.

Next, the IJ found that Petitioner also did not qualify for asylum or for withholding of removal because he neither suffered past persecution nor established a well-founded fear of future persecution based on his membership in a particular social group ("PSG"). As to past persecution, the IJ found that the single death threat that Petitioner received did not rise to the requisite level of severity that, in the IJ's view, is required under this Court's precedents. And as to the well-founded fear of future persecution requirement, the IJ found that Petitioner failed to establish that he belonged to a PSG. The IJ explained that Petitioner's proposed PSG, "returning migrants from the United States," lacked the requisite particularity because it was "too broad" and "would place every individual who leaves Honduras as part of a [PSG] eligible for asylum." A.R. 149.

6

Finally, the IJ found that Petitioner did not qualify for protection under the CAT, because he "has not met his burden to show that public officials in Honduras are unable or unwilling to protect" him. A.R. 150.

Petitioner appealed the IJ's decision to the BIA. On appeal, the BIA affirmed the IJ's findings as to Petitioner's ineligibility for asylum and for withholding of removal for largely the same reasons as the IJ. However, the BIA vacated and remanded the IJ's order as to Petitioner's CAT claim because the IJ "did not make sufficient factual findings regarding how [Honduran] officials would likely react" to Petitioner's claim that he would be tortured if he returned to Honduras. A.R. 61.

2.

On remand, the only additional evidence submitted to the IJ was the brief that Petitioner submitted to the BIA during his initial appeal. A.R. 51. Based on the entirety of the record, including all evidence submitted at the December 2018 hearing, the IJ again held that Petitioner was not entitled to protection from removal under the CAT.

In his decision, the IJ recognized Petitioner's evidence that the Honduran Government lacked resources to sometimes fully investigate and prosecute cases and that criminals operate with a high level of impunity. In addition, the IJ considered Petitioner's anecdotal evidence regarding "Luis" and his cousin; his claim that Honduran police have done nothing to follow-up on the police report his aunt filed; and Petitioner's claim that if he were to return to Honduras, the police would notify Mara 18 gang members that he returned.

However, the IJ concluded that Petitioner "has not met his burden to demonstrate it is more likely than not Honduran government officials would acquiesce to his feared torture." A.R. 52. First, the IJ noted that the record "includes many instances of police officers being prosecuted and punished" for engaging in criminal behavior, pointing to the work of the Police Purge Commission in removing 4,445 officers between April and November of 2016. A.R. 53. And while Petitioner claimed that there were 194 corrupt police officers in 2014, the IJ found that "approximately 194 corrupt officers out of tens of thousands of police officers in 2014 does not make it more likely than not a government official would acquiesce to [his] torture in 2019." *Id.* Indeed, while recognizing that Petitioner claimed that "Luis" was murdered by gang members in 2012 after filing a police report, the IJ "note[d] that this occurred in 2012 and Honduras has made gains to punish corrupt officers and deter crime since that time." *Id.* Finally, the IJ found that Petitioner "has not provided evidence that if he sought police protection in anticipation of or upon his return to [Honduras] that he would be denied assistance, or that corrupt police told the gang members that [his] aunt filed a police report," especially considering "[t]he police did not turn [Petitioner's] aunt away upon hearing of the potential crime and instead created a police report." *Id.*

Petitioner appealed this second order to the BIA, and this time it affirmed the IJ. The BIA "discern[ed] [no] clear error in the [IJ's] factual finding that the police accepted [Petitioner's] aunt's report about the threats he had experienced, and did not turn her away or refuse to take action." A.R. 4. It further explained that any alleged "failure to investigate . . . does not show that a public official has or would breach a legal duty to

8

intervene in any severe pain or suffering [caused] by the Mara 18." *Id.* And it found no clear error in the IJ's weighing of the evidence regarding police corruption in Honduras, holding that "the incidents of corruption, compared to the prosecution of such corruption, do not establish that it is more likely than not a public official would acquiesce." A.R. 5.

Petitioner thereafter timely appealed from the BIA's second order. Because we only have jurisdiction to review final orders from the BIA, *see* 8 U.S.C. § 1252, we are satisfied that Petitioner's timely appeal gives us jurisdiction over both of the BIA's decisions, as the BIA's first decision remanding Petitioner's case in part was not a final order under § 1252.

## II.

Upon a petition for review of a final BIA order, this Court reviews all factual findings for substantial evidence, and all legal conclusions de novo. *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018). Congress has statutorily prescribed for us a particularly stringent standard of review for factual findings, mandating that they be deemed "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Salgado-Sosa*, 882 F.3d at 456.

Initially, the parties dispute the scope of our review. Petitioner argues that we may only review the BIA's orders, whereas the Government contends that we may review both the IJ's and the BIA's decisions. Congress has said that we may "decide the petition only on the administrative record on which the order of removal is based," 8 U.S.C. § 1252(b)(4)(A), and ordinarily that means that our review is limited to the BIA's final order, *see Martinez v. Holder*, 740 F.3d 902, 908 & n.1 (4th Cir. 2014). Here, given that

9

the Government advocates for a more expansive review, we will accept *arguendo* that it is appropriate to look through to the IJ's decisions and rationale, because even in doing so, we discern no factual or legal error in any of the relevant decisions.

III.

Petitioner asserts that the BIA reached four erroneous conclusions. He posits that his unlawful wounding conviction cannot qualify as an "aggravated felony" under the Immigration and Nationality Act ("INA") and, therefore, he qualifies for asylum. He next argues that the BIA erred in upholding the IJ's findings that Petitioner neither suffered past persecution nor was a member of a cognizable PSG, and thus failed to establish his entitlement to withholding of removal. Finally, he claims that he is entitled to CAT protection because the BIA clearly erred in finding that it was not likely that the Honduran Government would acquiesce to his claimed torture should he be returned to Honduras. We address each contention in turn.

A.

We begin with Petitioner's contention that his unlawful wounding conviction under Virginia Code § 18.2-51 is not an "aggravated felony" under the INA. This claim we review de novo. *Castillo v. Holder*, 776 F.3d 262, 267 (4th Cir. 2015).

The INA deems ineligible for asylum any alien who has been convicted of an "aggravated felony." 8 U.S.C. § 1101(a)(43). The term "aggravated felony" encompasses, *inter alia*, any conviction that is a "crime of violence," as that term is defined in 18 U.S.C. § 16, "for which the term of imprisonment [is] at least one year." 8 U.S.C.

10

§ 1101(a)(43)(F); *see United States v. Pena*, 952 F.3d 503, 507 (4th Cir. 2020). Section 16(a) of Title 18, in turn, defines a "crime of violence" as any "offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another."[2] Following the Supreme Court's direction, we have said that "physical force," as that term is used in § 16, "means *violent* force—that is, force capable of causing physical pain or injury to another person." *Karimi v. Holder*, 715 F.3d 561, 566 (4th Cir. 2013) (quoting *Johnson v. United States*, 559 U.S. 133, 140 (2010)).

To determine whether a particular conviction is a "crime of violence," we utilize the "categorical approach" or, in some cases, the "modified categorical approach." *See Karimi v. Holder*, 715 F.3d 561, 567 (4th Cir. 2013). Both Petitioner and the Government agree that in this case, Virginia's unlawful wounding statue is examined using the categorical approach. Thus, our task is to "look[] only to the statutory definition of the state crime and the fact of conviction to determine whether the conduct criminalized by the statute, including the most innocent conduct," necessarily entails the use, attempted use, or threatened use of "physical force." *Id.* at 566–67 (citation omitted).

Petitioner argues that his unlawful wounding conviction is not an "aggravated felony" because the "bodily injury" that is required under the statute can result by indirect means such as "guile, deception, trickery or deliberate omission, none of which would necessarily entail" physical force. Opening Br. 14. As the Government correctly points out,

---

[2] Subsection (b), the "residual clause," has since been deemed unconstitutionally vague by the Supreme Court. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1213–16 (2018).

however, Petitioner's contentions are foreclosed by our recent decision in *United States v. Rumley*, 952 F.3d 538 (4th Cir. 2020).[3]

*Rumley* considered whether Virginia Code § 18.2-51 was a "violent felony" under the Armed Career Criminal Act ("ACCA"), which is defined as "any crime punishable by imprisonment for a term exceeding one year . . . that has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). Under the ACCA, "'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140.

Guided by *Johnson* and the Supreme Court's later decision in *United States v. Castleman*, 572 U.S. 157 (2014), we held that Virginia's unlawful wounding statute was a "violent felony." We explained that "the minimum conduct necessary for conviction under § 18.2-51 is 'causing a person bodily injury' by any means and 'with the intent to maim, disfigure, disable, or kill.'" *Rumley*, 952 F.3d at 550 (alterations omitted) (quoting Va. Code Ann. § 18.2-51). While we noted that "bodily injury" could occur through indirect means, we made clear that this was irrelevant, because section 18.2-51 requires *both* the

---

[3] Petitioner does not contest that his twelve-month sentence for Virginia unlawful wounding meets the INA's requirement that he be previously convicted of a crime of violence "for which the term of imprisonment [is] at least one year." 8 U.S.C. § 1101(a)(43)(F); *see* 8 U.S.C. § 1101(a)(48)(B) ("Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part."); *Wireko v. Reno*, 211 F.3d 833, 834–35 (4th Cir. 2000) (finding that a Virginia misdemeanor conviction qualified as an "aggravated felony" under § 1101(a)(43)(F), even though the state court suspended the entirety of the twelve-month sentence imposed).

causation of bodily injury *and* "that the person causing the injury have acted with the specific intent to cause severe and permanent injury," so the crime "requires a use of physical force, *even if* the means used are indirect." *Id.*

*Rumley*'s rationale mandates the conclusion here that Virginia Code § 18.2-51 is a "crime of violence" under 18 U.S.C. § 16(a), since it has as an element the use of "physical force." Virginia Code § 18.2-51 is therefore an "aggravated felony" under the INA.

Petitioner argues that *Rumley* does not control here because it was an ACCA case, not an INA case. That is a distinction without a difference. In no less than three published decisions issued since *Johnson*, we have utilized *Johnson*'s definition of "physical force" under the ACCA in interpreting the meaning of that same phrase in 18 U.S.C. § 16. *See Karimi*, 715 F.3d at 569 (quoting *Johnson* for the definition of "physical force" as used in § 16); *Mondragon v. Holder*, 706 F.3d 535, 545 (4th Cir. 2013) (same); *United States v. White*, 606 F.3d 144, 153 (4th Cir. 2010) ("We see little, if any, distinction between the 'physical force' element in a 'crime of *violence*' in § 16 . . . [and] a '*violent* felony' under [the ACCA.]"), *abrogated on other grounds by Castleman*, 572 U.S. at 167–68. The Supreme Court all but endorsed that approach in *Dimaya* when, in discussing the flaws in 18 U.S.C. § 16(b)'s residual clause, it observed that "[i]n interpreting statutes like § 16(b), this Court has made clear that 'physical force' means 'force capable of causing physical pain or injury.'" 138 S. Ct. at 1220 (quoting *Johnson*, 559 U.S. at 140). Lest there be any uncertainty, we confirm today that the phrase "physical force" under 18 U.S.C. § 16 and the ACCA have the same meaning. Thus, based on *Rumley*, Petitioner is ineligible for asylum because of his conviction for unlawful wounding under Virginia Code § 18.2-51.

13

B.

We next consider Petitioner's challenges to the IJ's and the BIA's determination that he did not qualify for withholding of removal. We note that despite being ineligible for asylum by his conviction of an "aggravated felony," that conviction did not disqualify him from withholding of removal because he was sentenced to less than five years' imprisonment. *See* 8 U.S.C. § 1231(b)(3)(B)(ii).

The INA provides that the Attorney General "may not remove" an alien to a country if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1231(b)(3)(A); *see also* 8 C.F.R. § 208.16(b)(2). "Because withholding of removal is mandatory if the alien meets the standard of proof," *Gomis v. Holder*, 571 F.3d 353, 359 (4th Cir. 2009), the alien "must show a 'clear probability of persecution' on account of a protected ground" to obtain withholding of removal, *Djadjou v. Holder*, 662 F.3d 265, 272 (4th Cir. 2011) (quoting *Dankam v. Gonzales*, 495 F.3d 113, 115 (4th Cir. 2007)).

Petitioner asserts that his life would be threatened in Honduras because of his membership in the PSG "returning migrants from the United States." To establish that this is a legally cognizable PSG, Petitioner must show that (1) members of that group "share common, immutable characteristics," (2) those shared characteristics "give its members social visibility," and (3) "the group is defined with sufficient particularity to delimit its membership." *Canales-Rivera v. Barr*, 948 F.3d 649, 654 (4th Cir. 2020) (citation omitted). Both of the decisions below rested only on the particularity requirement, and so our review is cabined accordingly.

14

The particularity element "requires that a PSG has 'discrete' and 'definable boundaries—it must not be amorphous, overbroad, diffuse, or subjective.'" *Amaya v. Rosen*, 986 F.3d 424, 427 (4th Cir. 2021) (quoting *Matter of M-E-V-G*, 26 I&N Dec. 227, 239 (BIA 2014)). In other words, "is it evident from the group's description who is in and who is not?" *Id.* at 434. Because "the purpose of the particularity requirement is 'to avoid indeterminacy,'" we have consistently "rejected proposed PSGs that share only 'amorphous characteristics that neither provide an adequate benchmark for determining group membership . . . nor embody concrete traits that would readily identify a person as possessing those characteristics.'" *Id.* at 429 (alteration in original) (citations omitted). Whether a PSG lacks particularity is a question of law that we review de novo. *Id.*[4]

Petitioner argues that the IJ and the BIA erred in finding that his proposed PSG—"returning migrants from the United States"—lacked particularity. He asserts that there are "clear and adequate benchmarks for determining group membership," as the words "returning" and "migrant" "have clear, definite meanings." Opening Br. 22. He further posits that while this group is broad, it does not detract from its particularity, citing as evidence the fact that the Honduran Government funds a program that is designed to help certain returning migrants reintegrate into Honduran society. These arguments are unconvincing.

---

[4] While *Amaya* noted some uncertainty regarding the extent of *Chevron* deference afforded to the BIA's PSG determinations in a particular case, *see* 986 F.3d at 431–32, it is at least clear that where, as here, the BIA issues a single-judge, nonprecedential ruling, there can be no *Chevron* deference, *Martinez*, 740 F.3d at 909–10.

The PSG "returning migrants from the United States" is precisely the type of amorphous and overbroad group that cannot satisfy the particularity requirement, for it provides no "adequate benchmark for determining group membership." *Amaya*, 986 F.3d at 429 (citation omitted). While Petitioner claims that "returning" and "migrant" have clear meanings, he has not explained what those clear meanings are, nor can we discern them. For instance, "returning" can be read to include not just deportees, but also those individuals who (like Petitioner once was) are "returning" to Honduras pursuant to a grant of voluntary departure, or who are simply "returning" to Honduras temporarily to visit their family or friends. Likewise, "migrants" can be read to include not just deportees, but also, *inter alia*, those individuals returning to Honduras after the expiration of a temporary work or study visa. And, as the Government points out, Petitioner has "never elaborated on how long a person [must have] lived outside Honduras to be considered a 'migrant.'" Response Br. 30. Thus a "returning migrant" under Petitioner's construct could include a person returning to Honduras after a vacation in the United States. Finally, Petitioner's reliance on a Honduran governmental program to aid certain returning migrants does not establish particularity: it is simply too imprecise and undefined to inform our particularity analysis. *See Amaya*, 986 F.3d at 432–33 (emphasizing the need to consider the particularity and social distinction requirements "separately and with integrity to their purposes"); *Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1309, 1311 (11th Cir. 2019) (concluding that the proposed PSG "Mexican citizens targeted by criminal groups because they have been in the United States and they have families in the United States" failed the particularity requirement because the group "lacked any definable boundaries and actually encompassed

16

a very large percentage of the Mexican population," including "Mexican citizens who have only *visited* the United States").[5]

In short, it is not "evident from [Petitioner's] group's description who is in and who is not," *Amaya*, 986 F.3d at 434, so Petitioner's proposed PSG fails the particularity requirement as a matter of law. Accordingly, we find no error in the denial of his claim for withholding of removal.[6]

C.

Finally, we consider Petitioner's contention that the CAT entitles him to protection from removal. Despite his ineligibility for asylum based on his unlawful wounding conviction, that conviction does not disqualify him from CAT protection because he

---

[5] Notably, our sister circuits have also upheld the denial of claims for withholding of removal on particularity grounds where the alien claims membership in the similar but even narrower PSG of migrants "returning from the United States who are perceived as wealthy." *Matul-Hernandez v. Holder*, 685 F.3d 707, 712–13 (8th Cir. 2012); *accord, e.g.*, *Ramirez-Munoz v. Lynch*, 816 F.3d 1226, 1228–29 (9th Cir. 2016) (holding that the PSG of "imputed wealthy Americans," i.e., those individuals returning to Mexico who are "light-skinned, fit, and have American mannerisms or accents" and are therefore perceived to be wealthy, lacked particularity); *Gonzalez-Soto v. Lynch*, 841 F.3d 682, 684 (5th Cir. 2016) ("[P]ersons believed to be wealthy because they are returning to their home country from the United States do not constitute a sufficiently particular social group[.]").

[6] Given this holding, we need not address Petitioner's contention that the IJ and the BIA erred in holding that he did not suffer past persecution based on the single death threat he received from Mara 18 gang members.

We also note that this holding is a separate and independent ground for affirming the IJ's and BIA's denial of Petitioner's asylum application. *See Salgado-Sosa*, 882 F.3d at 456 (explaining that both claims for asylum and withholding of removal require the alien to prove that he has been persecuted on account of some statutorily protected status, such as membership in a PSG (citing 8 U.S.C. §§ 1101(a)(42)(A), 1231(b)(3)(A)).

received less than a five-year prison term. *See* 8 U.S.C. § 1231(b)(3)(B)(ii); 8 C.F.R. § 1208.16(d)(2).

To obtain protection from removal under the CAT, Petitioner must show "that it is more likely than not that he will be tortured if removed" to Honduras, and "that this torture will occur at the hands of government or with the consent or acquiescence of government." *Martinez*, 740 F.3d at 913–14 (emphasis omitted) (quoting *Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012)); *see* 8 C.F.R. § 1208.16(c)(2). "A public official acquiesces to torture if, 'prior to the activity constituting torture, the official has awareness of such activity and thereafter breaches his or her legal responsibility to intervene to prevent such activity.'" *Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011) (alterations omitted) (quoting 8 C.F.R. § 1208.18(a)(7)). Such "awareness" can be shown either through "actual knowledge or willful blindness." 8 C.F.R. § 1208.18(a)(7). We review the denial of CAT relief for substantial evidence, *Mulyani v. Holder*, 771 F.3d 190, 200 (4th Cir. 2014), and conclude that the decisions below are so supported.

Petitioner largely focuses on how the documentary and anecdotal evidence he provided is "sufficient . . . to show acquiescence of police authorities to his torture." Opening Br. 23. But "our task at this juncture '*is not to reweigh the evidence* and determine which of the competing views is more compelling.'" *Mulyani*, 771 F.3d at 200 (emphasis added) (citation omitted). "It is instead to ensure that substantial evidence supports the BIA's judgment," *id.* (citation omitted), and that "unrebutted, legally significant evidence is not arbitrarily ignored by the fact finder," *Cordova v. Holder*, 759 F.3d 332, 340 (4th Cir. 2014) (citation omitted). Thus, "where the 'record plausibly could support two results:

18

the one the IJ chose and the one the petitioner advances,' reversal is only appropriate where the court 'finds that the evidence not only supports the opposite conclusion, but *compels* it.'" *Niang v. Gonzales*, 492 F.3d 505, 511 (4th Cir. 2007) (alterations and citation omitted).

Cabining our review accordingly, we conclude that the IJ's and the BIA's view of the record is amply justified. The IJ and the BIA considered all of the evidence that Petitioner cites on appeal; they simply weighed it differently than he does. *See* A.R. 5 ("[R]espondent does not submit any country conditions information or other evidence the [IJ] did not consider, other than counsel's assertions, which are not evidence."). And the inferences the IJ and the BIA drew from those facts—for example, that the Honduran Government had taken significant steps since Luis' alleged killing in 2012 to combat police corruption—were reasonable and supported by the documentary evidence that Petitioner himself submitted. Petitioner's cited evidence and the inferences he draws therefrom could plausibly support the result he advances, but given the contrary evidence in the record, we cannot say that the result he advances is compelled. *Niang*, 492 F.3d at 511; *see also Mulyani*, 771 F.3d at 200 (recognizing that the petitioner submitted probative evidence in support of his position, but finding that none of it was "sufficient to overcome our standard of review"). Thus, Petitioner's CAT claim fails.

IV.

For these reasons, the petition for review is

*DENIED.*

19