**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2013**

———————

MARIO ALEXANDER SIERRA-RIVERA,

      Petitioner,

   v.

MERRICK B. GARLAND, Attorney General,

      Respondent.

———————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————

Argued: January 25, 2023                   Decided: June 5, 2023

———————

Before GREGORY, Chief Judge, AGEE and DIAZ, Circuit Judges.

———————

Petition for Review denied by unpublished opinion. Judge Agee wrote the opinion, in which Judge Diaz joined. Chief Judge Gregory wrote a dissenting opinion.

———————

**ARGUED:** Ronald Darwin Richey, LAW OFFICE OF RONALD D. RICHEY, Rockville, Maryland, for Petitioner. Jessica Danielle Strokus, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Brian M. Boynton, Acting Assistant Attorney General, Anthony C. Payne, Assistant Director, Abigail E. Leach, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

Mario Alexander Sierra-Rivera petitions for review of a Board of Immigration Appeals ("BIA") decision affirming an Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the Convention Against Torture ("CAT"). We agree with the BIA that Sierra-Rivera failed to establish membership in a cognizable particular social group ("PSG") such that his asylum and withholding of removal claims fail. We also hold that substantial evidence supports the BIA's and IJ's finding that he failed to show that he would more likely than not be tortured in Honduras with the consent or acquiescence of a public official such that his CAT claim fails. We therefore deny the petition for review.

I.

The following facts are drawn from an uncontested record established during the proceedings before the IJ. In April 2014, Sierra-Rivera was a college student in Honduras when cartel members kidnapped him as he was walking home from school. They drove him to the house of their leader, who asked Sierra-Rivera to become a cartel member and sell drugs at his university. He refused and was taken to a distant location and left there to make his way home.

A few months later, Sierra-Rivera was on his way to school when cartel members kidnapped him for a second time. After he again refused to work with the cartel, its members told him that they would give him one last chance to join and that they would kill him if he refused.

3

After this incident, Sierra-Rivera went to the police to report the kidnappings, but they refused to take a report because he had no proof of or any witnesses to either incident. Sierra-Rivera testified that the police told him that he could either join the cartel or leave the area. He then moved an hour away to live with his grandmother and stayed there for two months. During that time, the cartel did not approach or contact him. Then, in September 2014, he left for the United States and entered the country the following month without a valid entry document. He was detained and underwent a credible fear interview, after which an asylum officer found that he demonstrated a credible fear of torture.

Sierra-Rivera then filed an application for asylum, withholding of removal, and relief under the CAT. In support of his application, he offered an affidavit recounting the foregoing facts and a State Department report on human rights conditions in Honduras (the "Report"). The Report described "[p]ervasive societal violence" in Honduras and indicated that gangs and narcotics traffickers were "significant perpetrators of violent crimes" who "committed acts of murder, extortion, kidnapping, torture, human trafficking, and intimidation." A.R. 173. It indicated that various public officials were corrupt and committed human rights abuses, including torture, which contributed to "widespread impunity." A.R. 173.

After a hearing, the IJ denied Sierra-Rivera's application. On his asylum and withholding of removal claims, it reasoned that his proposed PSG—"Honduran male[s] who reported to the police drug cartel activity, but the police failed to take action," A.R. 85—was not sufficiently particular. Further, the IJ concluded that Sierra-Rivera's personal belief that the police would not protect him from the cartel was insufficient to establish that

4

the government was unwilling or unable to protect him. The IJ also noted that Sierra-Rivera testified that he moved after he was threatened by the cartel and that the cartel did not approach or threaten him in his new location. As a consequence, the IJ reasoned that his speculation that the cartel might find him and harm him was insufficient to establish that internal relocation was not a reasonable possibility. Next, in denying his CAT claim, the IJ determined Sierra-Rivera did not establish that he would more likely than not be tortured by or at the instigation of or with the consent of a public official in Honduras.

The BIA dismissed Sierra-Rivera's appeal, agreeing with the IJ on the asylum and withholding claims that he did not propose a particular PSG, and also concluding that his proposed PSG was not socially distinct. As to the CAT claim, the BIA found no clear error in the IJ's determination that Sierra-Rivera did not establish that he would more likely than not be tortured in Honduras. The BIA reasoned that he had never been physically harmed by the cartel; he was not threatened or approached after he relocated; and his fear that the cartel would locate him elsewhere in Honduras and torture him was speculative. Sierra-Rivera filed a timely petition for review of the BIA's decision. We have jurisdiction over this petition under 8 U.S.C. § 1252.

On appeal, Sierra-Rivera asserts that he is entitled to asylum and withholding of removal because, *inter alia*, he proposed a cognizable PSG. As for his CAT claim, Sierra-Rivera argues that he sufficiently established that he would face torture in Honduras by or with the consent or acquiescence of a public official. We address each argument in turn, reviewing legal conclusions de novo and factual findings for substantial evidence. *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014). "We must uphold the BIA's decision unless

5

it is 'manifestly contrary to law and an abuse of discretion[,]'" such as if the BIA does not provide a reasoned explanation for its conclusion or distorts or disregards important parts of the claim. *Id.* (citation omitted). When conducting this review, we consider both the BIA's and IJ's decisions to the extent that the BIA's decision adopts and affirms the IJ's analysis. *See id.*

## II.

Turning first to the asylum claim, to establish eligibility, an applicant must show that he or she is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [his or her country of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Here, Sierra-Rivera claims persecution only based on membership in a PSG.

In order to be cognizable, a proposed PSG must be, *inter alia*, "defined with particularity, and . . . socially distinct within the society in question." *Nolasco v. Garland*, 7 F.4th 180, 187 (4th Cir. 2021) (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014)). The particularity requirement dictates that the PSG have "well-defined boundaries." *Lizama v. Holder*, 629 F.3d 440, 447 (4th Cir. 2011); *Morales v. Garland*, 51 F.4th 553, 557 (4th Cir. 2022) (explaining that particularity requires that the "group must erect 'definable boundaries so that it is sufficiently clear who is in and out'"). Whether a PSG is sufficiently particular is a question of law that this Court reviews de novo. *Amaya v. Rosen*, 986 F.3d 424, 429 (4th Cir. 2021). The social distinction prong requires "evidence

6

that society in general commonly considers persons sharing the particular characteristic to be a group." *Nolasco*, 7 F.4th at 188. Whether a given society views a proposed PSG as socially distinct is a question of fact that the Court reviews for substantial evidence. *Id.* at 189.

Here, Sierra-Rivera claims he is a member of the following PSG: "Honduran male[s] who reported to the police drug cartel activity, but the police failed to take action." A.R. 85. But in *Morales v. Garland*, we rejected a similar PSG—"Salvadorean women who are witnesses to gang criminal activity and targeted because they filed a police report"—as lacking particularity and social distinction. 51 F.4th at 556–57. On particularity, we reasoned that the traits in the *Morales* PSG were "amorphous, overbroad, diffuse, and subjective" because, for example, the terms and phrases "witnesses," "criminal activity," and "targeted" each have multiple meanings. *Id.* at 557 (cleaned up). On social distinction, we concluded that the alien had not "marshalled adequate evidence that Salvadorean society view[ed] her proposed group as 'set apart . . . in some significant way.'" *Id.* at 558 (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. at 238). Specifically, we found that the record showed "that gang violence afflict[ed] large swaths of the Salvadorean public" such that the alien's "proposed subset of informants—women who file a police report and are targeted as a result—are not regarded by the whole of Salvadorean society as in some way 'discrete.'" *Id.* (quoting *Amaya*, 986 F.3d at 437).

Sierra-Rivera's proposed PSG suffers from the same infirmities as the PSG considered in *Morales*. It lacks particularity because, despite Sierra-Rivera's assertion that his PSG has clearly defined boundaries, "report" and "drug cartel activity" do not have

7

clear meanings such that it is evident who is included in the group and who is not. *See Moreno-Osorio v. Garland*, 2 F.4th 245, 255 (4th Cir. 2021) (finding a lack of particularity because the terms defining the PSG did not have clear meanings); *Morales*, 51 F.4th at 557 (same). For example, "report" could require filing a formal police report, or it could simply mean bringing cartel activity to the police's attention, as Sierra-Rivera did. And like "criminal activity" in the *Morales* PSG, "drug cartel activity" could include a wide range of behaviors, including not only various crimes committed by the cartel, but also mundane noncriminal tasks performed by members on behalf of the cartel. *See* 51 F.4th at 557 ("'Criminal activity' could span 'offenses ranging in severity from petty theft to first-degree murder.' We have, in fact, rejected 'criminal history' as an insufficiently particular trait, reasoning that the term could 'mean anything from a reputation for committing crimes to an actual criminal record.'" (quoting *Lizama*, 629 F.3d at 447)). Sierra-Rivera's proposed PSG is thus too amorphous to meet the particularity requirement. *See Zelaya v. Holder*, 668 F.3d 159, 166 (4th Cir. 2012) ("[O]pposition to gangs is an amorphous characteristic[.] Resisting gang recruitment is similarly amorphous, and the fact that Zelaya's conduct in resisting recruitment included complaining twice to the police adds little to the particularity equation[.]" (internal citation omitted)).[1] This alone is sufficient

---

[1] Sierra-Rivera also argues that the BIA did not adequately explain its reasoning when finding that he did not establish particularity. But the BIA need only "announce their decisions in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted." *Nolasco*, 7 F.4th at 190 (citation omitted). The BIA met this standard here through its citations to relevant case law in support of its particularity conclusion.

Sierra-Rivera further claims that the IJ erred in concluding that the proposed PSG

to defeat Sierra-Rivera's claim.

Notwithstanding that fact, we also conclude that substantial evidence supports the BIA's finding that he failed to establish social distinction. As in *Morales*, there is no evidence that Honduran society views the proposed group as "set apart . . . in some significant way." 51 F.4th at 558 (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. at 238). For example, the record does not contain evidence that individuals who report cartel activity to police are afforded special protection under Honduran law or are otherwise recognized in society. *See Conde Quevedo v. Barr*, 947 F.3d 1238, 1243–44 (9th Cir. 2020) ("Petitioner presented no evidence of a Guatemalan law or program protecting those who, without more, make police reports, and Petitioner presented no other evidence that Guatemalan society recognizes those who just report criminal activity of gangs to police as a particular social group."). Sierra-Rivera counters that the Honduran government recognizes witnesses to criminal activity as distinct through the government's creation of a witness protection program. But even assuming that is true, his PSG does not reference witness protection. Further, he was never a part of a witness protection program and therefore cannot be a part of a group defined by the existence of such a program.

---

is improperly defined by virtue of the harm experienced or feared. But assuming without deciding both that we can consider the IJ's decision on this issue and that the IJ erred, any such error is harmless because it does not affect the conclusion that the proposed PSG lacked particularity and social distinction. *See Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004) (explaining that reversal of an immigration decision is not required when an alleged error "clearly had no bearing on the procedure used or the substance of the decision reached" (quoting *Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964))).

We thus conclude that Sierra-Rivera failed to establish membership in a PSG such that his asylum claim fails.[2] And because Sierra-Rivera has not met his burden of establishing eligibility for asylum, he cannot meet his burden of proof on the withholding of removal claim. *Zelaya*, 668 F.3d at 161 ("[A]n alien who cannot meet his burden of proof on an asylum claim under the INA necessarily cannot meet his burden of proof on a withholding of removal claim under the INA.").

## III.

We next turn to Sierra-Rivera's CAT claim. A CAT applicant must establish that he or she will more likely than not be tortured if sent to the country of removal, *Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012), "and 'that this torture will occur at the hands of government or with the consent or acquiescence of government,'"[3] *Moreno-Osorio*, 2 F.4th at 256 (quoting *Martinez v. Holder*, 740 F.3d 902, 913–14 (4th Cir. 2014)). Our precedent requires consideration of several factors for this analysis:

> [A] determination of whether an individual is more likely than not to face torture if returned to the country of removal includes consideration of "evidence of past torture, whether the individual could relocate to another part of the country where she is not likely to be tortured, evidence of human rights violations in the country of removal, and any other relevant country-

---

[2] Sierra-Rivera also asserts that the BIA erred in its asylum analysis for other reasons, but we need not address these arguments because he failed to establish membership in a cognizable PSG.

[3] "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity. Such awareness requires a finding of either actual knowledge or willful blindness." 8 C.F.R. § 208.18(a)(7).

specific information."

*Ibarra Chevez v. Garland*, 31 F.4th 279, 288 (4th Cir. 2022) (quoting *Singh v. Holder*, 699 F.3d 321, 334 (4th Cir. 2012)). But when reviewing the BIA's decision on a CAT claim, this Court does not reweigh evidence on these factors. *Moreno-Osorio*, 2 F.4th at 256. Instead, we "ensure that substantial evidence supports the BIA's judgment and that unrebutted, legally significant evidence is not arbitrarily ignored by the fact finder." *Id.* (cleaned up).

We conclude that substantial evidence supports the BIA's and IJ's finding that Sierra-Rivera failed to establish that he will more likely than not be tortured in Honduras with the consent or acquiescence of a public official.[4] Sierra-Rivera argues that the BIA

---

[4] We consider both the BIA's and IJ's decisions because the BIA adopted the IJ's CAT analysis. *See Herrera-Alcala v. Garland*, 39 F.4th 233, 244 (4th Cir. 2022) ("Though we review the opinions of both the Immigration Judge and Board, we consider the Immigration Judge's decision only to the extent the Board's decision adopted it or incorporated it."). The BIA could have been clearer in its adoption, but its statement that "there is no clear error in the Immigration Judge's [CAT] determination" is sufficient to incorporate the IJ's decision and thus trigger our review of both decisions. A.R. 4; *see Singh v. Sessions*, 880 F.3d 220, 224 (5th Cir. 2018) ("Here, the BIA found that the IJ's adverse credibility determination was not clearly erroneous, essentially adopting the IJ's reasoning. Accordingly, we have authority to review the IJ's decision as well as that of the BIA."); *Garcia-Moctezuma v. Sessions*, 879 F.3d 863, 869 (8th Cir. 2018) (explaining that the BIA adopted the IJ's findings such that the court would review both the BIA's and IJ's decisions where the BIA "'discern[ed] no clear error' in the IJ's findings"); *Mohammed v. U.S. Att'y Gen.*, 547 F.3d 1340, 1344 (11th Cir. 2008) (explaining that it reviewed both the BIA's and IJ's decisions "to the extent that the Board expressly adopted" the IJ's opinion by agreeing with its factual findings on a particular issue).

The dissent disagrees that the BIA adopted the IJ's CAT analysis and claims that our precedent supports the opposite conclusion. But—as the dissent recognizes—"this Court has not squarely articulated what language triggers the BIA's adoption of an IJ's decision." *Post* at 19. Moreover, in the cases the dissent cites, this Court did not quote the portions of the BIA's decision that led to the Court's conclusion, nor did it thoroughly

11

and IJ failed to consider all relevant evidence. But they considered all the evidence to which he cites on appeal and drew reasonable inferences therefrom such that the result Sierra-Rivera advances is not compelled. *Id.* at 257.

First, the BIA and IJ considered Sierra-Rivera's interaction with the Honduran police. Sierra-Rivera claims that the fact the police refused to help him shows that they would acquiesce in his torture. But substantial evidence supports the BIA's and IJ's finding that the police did not refuse to help him but simply could not take his report because he did not have proof of or witnesses to the cartel's conduct. *Compare* A.R. 96 (in response to a question regarding why the police refused to take a report, Sierra-Rivera said, "Because I didn't have proof. I didn't have witnesses."), *with Zelaya*, 668 F.3d at 167 (granting petition for review of a CAT claim because when the noncitizen reported a gang shooting at him to the police, "a police officer told him that the police could not help him because MS-13's members would hurt them as well," and the BIA did not explain why this did not suffice to meet his burden on the CAT claim).

Second, the BIA and IJ considered the Report. Sierra-Rivera claims that the Report shows that government officials are corrupt and commit human rights abuses, indicating that they would acquiesce in his torture. He is correct that the Report describes human

---

explain why it interpreted the BIA's decision as not adopting the IJ's opinion. In fact, the dissent goes to great lengths to compare the Court's opinions to the records in those cases in order to speculate on what in the records may have led the Court to conclude that the BIA did not adopt the IJ's decision. But we decline to so speculate.

When faced with a lack of clear Fourth Circuit authority to aid us, we turn to the persuasive authority from our sister circuits which, as discussed above, indicates that when the BIA finds no clear error in an IJ decision, that is sufficient to incorporate the IJ decision and thus trigger our review of both decisions.

rights abuses by public officials, but he overlooks other portions of the Report. Specifically, as the IJ summarized, the Report also shows that "the police are working in conjunction with the military in order to address the significant problems of criminality in Honduras" and that "offices such as the Office of the Attorney General and the Office of the Inspector General in Honduras [are] address[ing] the police and other governmental agency excesses." A.R. 69. Although some of these efforts have been ineffective thus far, the BIA and IJ reasonably concluded that the ineffectiveness of those efforts alone does not establish that the government or any particular public official would consent or be willfully blind to Sierra-Rivera's torture. *See Lizama*, 629 F.3d at 449–50 (finding that substantial evidence supported the denial of CAT relief because the record showed that the Salvadoran government was working to provide greater protection to the public from gang violence, meaning that the petitioner "failed to demonstrate that gangs or other criminal entities in El Salvador have the approval or acquiescence of the government of El Salvador"); *Herrera-Martinez v. Garland*, 22 F.4th 173, 187 (4th Cir. 2022) ("The only other evidence [the alien] points to in support of his CAT claim are articles and reports about living conditions within Honduras. But 'the mere existence of a patten of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would more likely than not be tortured.'" (quoting *Nolasco*, 7 F.4th at 191)).

In sum, the BIA and IJ considered all "legally significant evidence." *Moreno-Osorio*, 2 F.4th at 256. And while Sierra-Rivers contends that this evidence supports his claim for CAT relief, the evidence does not compel the finding that he would more likely than not be tortured if removed to Honduras. *Id.* at 256–57 ("[W]here the record plausibly

13

could support two results: the one the IJ chose and the one the petitioner advances, reversal is only appropriate where the court finds that the evidence not only supports the opposite conclusion, but compels it." (cleaned up)). Therefore, the BIA and IJ appropriately denied his CAT claim.

IV.

For the foregoing reasons, the petition for review is

*DENIED.*

14

GREGORY, Chief Judge, dissenting:

Mario Alexander Sierra-Rivera applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT") after cartel members in Honduras kidnapped him twice and threatened his life, and the Honduran police told him his only options were to join the cartel or leave. In support of his claims, Sierra-Rivera provided written and oral testimony recounting his persecution and interaction with the Honduran police, as well as a State Department report on human rights conditions in Honduras (the "Country Conditions Report") demonstrating the existence of pervasive gang violence in the country. The Immigration Judge ("IJ") denied all three claims, discussing this evidence only in its analysis of Sierra-Rivera's asylum claim. And without even a passing reference to the Country Conditions Report or Sierra-Rivera's testimony regarding the Honduran police's unwillingness to assist him, the Board of Immigration Appeals ("BIA") affirmed the IJ's across-the-board denial.

Because "[i]t is an abuse of discretion for the BIA or IJ to arbitrarily ignore relevant evidence," *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 974 (4th Cir. 2019), I would hold that the BIA's failure to discuss this evidence in its assessment of Sierra-Rivera's CAT claim constitutes reversible error. Therefore, I dissent from my colleagues' decision to affirm the BIA's denial of the CAT claim and would instead grant Sierra-Rivera's petition for review as to that claim, vacate the BIA's CAT decision, and remand for further proceedings.

I.

"Those who arrive at our border fleeing torture and seeking refuge under our laws 'have the right to know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate.'" *Cabrera Vasquez v. Barr*, 919 F.3d 218, 223 (4th Cir. 2019) (quoting *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009)). Therefore, "[a]lthough 'our job as a reviewing court is not to reweigh the evidence,' we must 'ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder' and that the agency does not 'base [its] decision on only isolated snippets of [the] record while disregarding the rest.'" *Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir. 2014) (quoting *Baharon*, 588 F.3d at 233). Such a failure to engage with "relevant evidence" constitutes an abuse of discretion. *Rodriguez-Arias*, 915 F.3d at 974. Applying that fundamental principle, this Court has held that "a wholesale 'failure [by] the IJ and BIA to consider evidence of country conditions constitutes reversible error.'" *Id.* (quoting *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 (9th Cir. 2010)). That is exactly what occurred here.

Perhaps recognizing this precedent, my colleagues in the majority expressed concern during oral argument about the procedural adequacy of the BIA's decision. Oral Argument at 18:25–19:03; 25:58–27:18. For good reason. Sierra-Rivera submitted a Country Conditions Report which demonstrates that in Honduras, gang violence is widespread, violence and criminal activity are largely unrestrained (and at times acquiesced or participated in) by the Honduran government, and government witnesses have been specifically targeted for violence. This evidence is "legally significant" because

16

it corroborates Sierra-Rivera's assertion, central to his CAT claim, that he will more likely than not be tortured by the cartel if he returns to Honduras. *Ai Hua Chen*, 742 F.3d at 179. Yet in affirming the denial of Sierra-Rivera's CAT claim, the BIA failed to even acknowledge the existence of the Country Conditions Report. Nor did the BIA engage with Sierra-Rivera's testimony that the Honduran police told him his only options were to join the cartel or leave, which directly bears on the Honduran government's acquiescence in his torture. The BIA's "wholesale failure" to consider this pertinent evidence is a classic example of "reversible error" under our precedent. *Rodriguez-Arias*, 915 F.3d at 974.

My colleagues indicated, however, that their concern turned on whether our review is confined to the BIA's decision (which entirely failed to discuss this evidence), or if we could also review the IJ's decision (which discussed this evidence in its asylum analysis). Oral Argument 27:52–28:15; 28:45–29:35. Because they now determine that the BIA adopted the IJ's CAT decision, allowing us to also review the IJ's analysis, they affirm the BIA's denial of Sierra-Rivera's CAT claim.

The procedural adequacy of the BIA's determination, even if it did adopt the IJ's decision, strikes me as specious. Unlike the majority, I am skeptical that the IJ's discussion of the Country Conditions Report and Sierra-Rivera's testimony in its discussion of Sierra-Rivera's *asylum* claim—which the majority does not hold the BIA adopted—satisfies its duty to consider all legally significant evidence when evaluating Sierra-Rivera's *CAT*

17

claim.* More fundamentally, though, I believe the majority erred by considering the IJ's decision at all.

Through 8 U.S.C. § 1252(a), Congress gave courts of appeals jurisdiction to review final orders of removal which, "in cases such as the one before us[,] are generally made by the BIA following appeal from the decision of the IJ." *Martinez*, 740 F.3d at 908 (quoting *Camara v. Ashcroft*, 378 F.3d 361, 366 (4th Cir. 2004)).  However, "when the BIA adopts the IJ's decision without an opinion of its own," or "adopts the IJ's opinion and supplements it with additional reasoning, . . . the BIA has determined that the IJ's opinion will become—in whole or in part—the final order of removal subject to review." *Id.*  In those cases, "it is appropriate for this Court to review [the] IJ's opinion." *Id.*  On the other hand, when "the BIA issue[s] its own detailed opinion affirming the IJ with further reasoning of its own but without expressly adopting the IJ's opinion," the IJ's opinion is not part of the final order of removal and, as a result, we must "focus our review on the BIA's decision." *Wambura v. Barr*, 980 F.3d 365, 368 n.2 (4th Cir. 2020).

---

* Indeed, the IJ's entire analysis of Sierra-Rivera's CAT claim consisted of just two sentences:

> The respondent's case fails to establish that it is more likely than not that he will be subjected to severe pain and suffering, whether physical or mental, by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.  His request for relief pursuant to [CAT] will be denied[.]

A.R. 70.

18

Here, the BIA used the following language when discussing Sierra-Rivera's CAT claim:

> [W]ith respect to the respondent's application for CAT protection, there is no clear error in the Immigration Judge's determination that the record does not indicate that it is more likely than not that the respondent will face torture in Honduras by or with the consent or acquiescence (to include willful blindness) of a public official or other person acting in an official capacity.

A.R. 4. According to the majority, by stating that "there is no clear error in the Immigration Judge's [CAT] determination," the BIA adopted the IJ's CAT analysis. It is unsurprising that the majority relies exclusively on out-of-circuit cases to support this contention. If the majority were to look at Fourth Circuit case law, it would find a large body of precedent that supports the opposite conclusion.

To be sure, this Court has not squarely articulated what language triggers the BIA's adoption of an IJ's decision. But we have made clear that when "the BIA does not *expressly* adopt any portion of the [IJ's] decision, we review only the findings and order of the BIA, not those of the IJ." *Li Fang Lin v. Mukasey*, 517 F.3d 685, 687 (4th Cir. 2008) (emphasis added); *see also Quintero v. Garland*, 998 F.3d 612, 622 (4th Cir. 2021).

Time and time again, we have applied that principle to hold that the BIA *did not* adopt the IJ's opinion where, as here, the BIA's decision stated that the IJ did not clearly err. In *Martinez*, for instance, we held that the BIA "issued its own opinion without adopting the IJ's opinion," 740 F.3d at 908, where the BIA stated that "the [IJ] did not commit clear error in determining that the respondent has not shown that it is more likely than not he would suffer torture by or with the acquiescence . . . of a public official, if returned to El Salvador," A.R. at 6, *Martinez*, 740 F.3d at 902 (No. 12-2424). Similarly,

19

in *Wambura*, we "focus[ed] our review on the BIA's decision," 980 F.3d at 368 n.2, which stated that "[t]he [IJ] did not clearly err in her prediction regarding the possibility of the respondent facing torture upon return to Tanzania," A.R. at 5, *Wambura*, 980 F.3d at 365 (No. 19-1360). *Compare also Tairou v. Whitaker*, 909 F.3d 702, 706 (4th Cir. 2018) (reviewing "the BIA's order rather than the IJ's ruling" because "the BIA did not adopt the IJ's opinion but instead offered its own reasons for denying relief"), *and Hernandez-Avolos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015) ("[W]here, as here, the BIA issues its own opinion without adopting the IJ's reasoning, we review only the BIA's final order."), *with* A.R. at 4, *Tairou*, 909 F.3d at 702 (No. 17-1404) (BIA stating that "the [IJ's] finding that the respondent has not established a well-founded fear of persecution is not clearly erroneous"), *and* A.R. at 4, *Hernandez-Avolos*, 784 F.3d at 944 (No. 14-1331) (BIA finding no "clear error in the [IJ's]" factual determinations relating to respondent's asylum claim).

The inverse of that principle is also true:  when "the BIA decision *expressly* has adopted the underlying decision of the IJ, we review both decisions." *Hernandez-Nolasco v. Lynch*, 807 F.3d 95, 97 (4th Cir. 2015) (emphasis added).  While we have not been entirely uniform in our approach, we have held that "the BIA adopt[ed] the IJ's opinion and supplement[ed] it with its own reasoning," *Sorto-Guzman v. Garland*, 42 F.4th 443, 447 (4th Cir. 2022), where the BIA stated that it "adopt[ed] and affirm[ed] the decision of the [IJ] for the reasons stated therein," A.R. at 2, *Sorto-Guzman*, 42 F.4th at 443 (No. 20-1762).  *Compare also Ai Hua Chen*, 742 F.3d at 177 ("[T]he BIA 'adopted and affirmed' the decision of the IJ"), *with* A.R. at 4, *Ai Hua Chen*, 742 F.3d at 171 (No. 12-2279) (BIA stating "we adopt and affirm the [IJ's] reasons for concluding that the respondents did not

meet their burden of proof" for seeking asylum).  Because the BIA did not use anything close to such express language here, I would circumscribe my review to only its decision. To do otherwise would risk expanding our jurisdiction beyond the "final order[s] of removal" Congress has authorized us to review.  8 U.S.C. § 1252(a)(1).

The majority's contrary position is belied by inconsistencies in its own reasoning. Elsewhere in its opinion, the majority declined to decide whether we can review the IJ's asylum decision, which the BIA stated that it "affirm[ed]."  A.R. 3.  Given that the BIA only "affirms" an IJ's factual determination if it finds "no clear error," I am hard pressed to see the difference between these phrases.  In my view, they are different sides of the same non-decision-adopting coin.  In determining that the BIA adopts an IJ's decision by merely stating that the IJ did not clearly err while leaving undecided the significance of this affirmance, the majority introduces fresh confusion for courts tasked with determining which of the agency's decisions to review.  I decline to join my colleagues in effectuating such an unworkable standard.

\*        \*        \*

My colleagues and I appear to agree that the BIA decision, standing alone, declined to engage with "relevant evidence" when assessing Sierra-Rivera's CAT claim.  *Rodriguez-Arias*, 915 F.3d at 974.  Indeed, we have recognized that "[a] State Department report on country conditions is highly probative evidence" considering the "expertise of the Department of State."  *Quitanilla v. Holder*, 758 F.3d 570, 574 n.6 (4th Cir. 2014) (quoting *Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir. 1999)).  And given the life-or-death stakes for a CAT petitioner like Sierra-Rivera, that evidence should not have been so blithely brushed

aside in the adjudication of his claims.  Simply put, "[d]enying [Sierra-Rivera's] CAT relief required more—much more—from" the BIA.  *Rodriguez-Arias*, 915 F.3d at 975.

Appropriately limiting our review to the BIA's opinion, therefore, I would vacate it with respect to Sierra-Rivera's CAT claim and remand for the BIA to "interact seriously with the full panoply of the risk-of-torture evidence submitted by [Sierra-Rivera], recognizing that country conditions alone can play a decisive role in granting relief under the [CAT]." *Id.* at 975 (quotation marks omitted).  Accordingly, I respectfully dissent.